May it please the Court, Michael Hannan for the Appellant Serengeti, Asset Management. The District Court made two key errors when it determined on the pleadings This has gone off again. Try it. Try it again? Can you hear me now? Very good. The District Court made two key errors when it determined on the pleadings Can you hear me? Hold on, Mr. Hannan. I don't know why it's not working here. Try speaking. Hello? No. Try speaking. Okay. I was talking about the two key errors on the pleadings. Can you hear me now? This is not working. Hold on, Mr. Hannan. We'll give you a time back. Thank you, Your Honor. I don't know why they're not working. It must be this courtroom. Okay. Try. Appellant Serengeti, Asset Management. Good? Excellent. All right. Mr. Cloughton, would you put the clock back to nine? Thank you. You can proceed. There were two key errors with the District Court determining that after Serengeti accelerated the Northlake CDO's most senior Class 1 notes, that American General's Class 1M notes should be paid before Serengeti's Class 1A notes. First, the District Court held that Article 7 subordination provision, Article 7 of the Security Agreement, that that subordination provision does not create special post-acceleration payment rules, which the record proves and the briefing proves is incorrect. Second, the District Court disregarded the plain-language answer to the dispute in this case found in the offering memorandum. Is the offering memorandum part of a transaction? I thought it specifically said it was not. The offering memorandum is absolutely part of both things that matter under English law and New York law for consideration in connection with analyzing the contracts here. Under English law, the offering memorandum is part of the factual matrix that must be considered when interpreting contracts under English law. And under New York law, the offering memorandum is part of the writings that form part of the Northlake transaction, which is why this Court in the Bank of America case held that documents like offering memorandums must be considered when analyzing trust documents. Okay. But doesn't Section 5 govern if there is a dispute with respect to any of the priorities? Absolutely not, Your Honor. Section 5 is expressly subject to Section 7. Section 7, subject to, means Section 7 modifies Section 5. Section 7, its entire purpose is to demonstrate those special rules that apply after an acceleration. There are two sentences in the first section of Section 7, 701a. The first says that in the ordinary course, the payment priorities as between the various classes of notes are governed by Section 5. That's the ordinary priority of payments. The very next section, sentence of Section 701 talks about what happens after an acceleration. After an acceleration, the rules change. Those rules are spelled out in Section 7. Those rules ---- What it says is that the class notes shall be paid in full in cash before any further distribution or payment is made on account of the subordinate interests. I don't see that the statement that they should be paid in cash in full deals with the problem of what if there's not enough cash. I don't see how that translates into pro rata. Your Honor, it translates into pro rata when you add the definition of the defined term used in that sentence that you just referenced. The definition of class 1 notes ---- and I'll bring it up because it's obviously critical to the dispute. Section 7 says that if any event of default has not been cured or waived ---- What page are you ---- I apologize. It is page 339 of the record. That's what I'm looking at. It's the subordination clause. It's the second sentence, second full sentence in 701A. It says if any event of default has not been cured or waived and acceleration occurs in accordance with the conditions entrusted, the class 1 notes shall be paid in full in cash. And then it goes on. Yes, but we have two categories. That's correct, Your Honor. And the question you say that there has to be pro rata. And all I'm suggesting is that those words that they have to be paid in full in cash don't say pro rata. They don't. And what if there's not enough cash? They don't say pro rata exactly, Your Honor. But one needs to look to the defined term class 1 notes to understand what Section 7's payment rule ---- Where is that? That's in the definition section. The definition of class 1 notes, and this is not disputed, is we can find a particular page reference. But class 1 notes are defined as the class 1A notes and the class 1M notes together. That's the definition. And we'll get to the page. We'll get the page reference. I understand that. But you're saying that they have to be paid pro rata. But this clause that you're relying on says it shall be paid in full in cash. The clause that we're ---- It doesn't say what happens. It does, because it says they need to be paid together. And the word together has meaning. Together has a temporal element to it. That would apply across the board. That would also apply in connection with other sections. And I wonder if you would tell me, maybe you're going to point me back to the definition of class 1 notes, but does ---- is there anywhere else in Section 7.01A that clearly says anything about the relative priority among the two series of class 1 notes, separate and apart from the definition? Separate and apart from the definition, no, Your Honor. The rules in Section 7, they're crystal clear. The class 1 notes ---- Isn't that an incredibly complicated, convoluted way, you are saying, of something that could have been said perfectly simply? I mean, one looks at this, and it looks as though there's one category of notes that is superior to another category of notes within one category. And that's the way it looks like. Now you're trying to tell us that in some circumstances they are not different, they are the same, because we should read into something what the word together means. And, you know, I guess it's conceivable, but one would have expected business people to have said that directly. Your Honor, the class 1A and 1M notes under every document in this transaction are pari pursu for all purposes, except as otherwise provided in the priority of payments. Why is it? Just educate me a little bit. I'm somewhat familiar with CDOs, but in another prosecutorial context. Why is it that the class 1MM notes would cede priority to the class 1A notes in the event of acceleration as a commercial matter? Your Honor, they didn't need to cede priority in the acceleration situation. What happened was there were 176 million worth of class M notes, and there were 156 million of class A notes. Combined, those notes reflected the controlling class 1 notes. And so prior to an acceleration event, there was a failure of a primary coverage test, and the class IM notes were repaid. And they were repaid $120 million of their principal before the class 1A notes. That was a huge advantage that the class 1M notes had. But now, at the moment in time where two things happened, first, there was an event of default under this transaction, such that there was no longer sufficient funds to repay all of the class 1 notes. And second, the Serengeti's class 1A notes became the majority. All of a sudden, after seven years of the class M's getting paid before the A's, the A's became the majority of the class 1 notes. And with becoming the majority senior controlling class holder, Serengeti had available to it the panoply of remedies that a controlling holder gets when there is an event of default. One of those remedies was acceleration, and acceleration has very clear textual ramifications in this deal. One can speculate why the drafters were not more clear when they used the word together only through a definition in Section 7. It does not change the fact that Section 7 clearly supersedes Section 5, lays out payment rules that apply post-acceleration. And to Your Honor's point, acceleration is an extraordinary remedy. Acceleration is not what the drafters were focused on when they put these documents together in 2003. Acceleration means, by and large, it's not enough to pay the most senior notes, and the deal is in extraordinary distress. It's basically done. Notes that were originally matured, that were going to mature in 2033, became due immediately. It is entirely commercially reasonable. It comports with business common sense and English law in SGMA, for that matter, that when there's something like an enforcement event, an acceleration, and Serengeti as the majority senior note holder declares notes due and payable immediately to it, that Serengeti gets to share together and pro rata in the proceeds of those notes. The fact is the plain language of Section 7, it's a contract, and it's the only provision in the contract that addresses this situation, payments principal to Class 1 note holders in the event of an acceleration. And what it says when one does something very simple, which is add the defined term, the definition to a defined term. Could you tell me again what it means when it says if there is an ambiguity or Section 5 governs, what does that mean? I can, Your Honor. It cannot and does not mean what I think Your Honor is asking about, which is that you resolve conflict between 5 and 7 in favor of 5. That can't be what 501H means because the whole purpose of Section 7 is that it supersedes Section 5. Section 5 is subject to Section 7. But, you know, you say that. On the other hand, it then says if there is a dispute, Section 5 governs. And, you know, I hear you saying the whole purpose of Section 7 is not to do that, but then there is mislanguage. Your Honor, there's no dispute that whatever Section 501H means as to inconsistency and I'll tell you what it means in a second, is not the superseding payment rules of Section 7. There is no dispute the trustee has been paying. There's no dispute, for example, that the payment rule that class one, after acceleration, that class one notes get paid before class two notes in every way caused the trustee to change the Section 5 payment rules, that in the event of what occurred, which was a conflict between Section 5's payment rules and Section 7's superseding subordination principles, the trustee went with Section 7's superseding principles. Why is it that in Section 5 there is this specific reference in connection with a reference, well, a reference to class one MM notes and class one A notes pro rata, as was suggested by Judge Corman earlier, and that pro rata language does not appear in 7.01A? I can't speculate why different terms. Well, what are we to do? Maybe I should put it this way. What do we draw from that? Because what you're asking for is an insertion of the term either pro rata or pari pursu in Section 7, based on the definition. The definition is together. So together has to mean something. So why does it appear here in Section 5 if you just told us that that is the class one notes, but here it's broken out. I'm looking at page A328, which refers to the principal amount of class one MM notes and the class one A notes pro rata. See at the top? We'd be speculating about why the drafters chose to use. No, we're not speculating. We just want to know what effect we should give to those words that are there and are not in the other section, and you tell us that the word together is so clear that it more than covers that. My problem is that the word together is not as clear as the word pro rata. Your Honor, that's absolutely correct. There's no question that if the word pro rata was used in Section 7, there'd be no dispute here. The word pro rata is used in the offering memorandum in the only crystal clear exposition. Usually, though, this is the first document that we should look at. Do you agree with that? The first? This is the articles 5 and 7 are the first provisions that we should review. And I understand that under English law, we should look at this as part of a factual matrix, whatever. One must look at it. Whatever that should, yes, must. But our attention in both briefs has been drawn to the language in this provision, right, and in Article 7. Is that correct? That's correct, Your Honor. And so all I am asking, and I think we've asked it once or twice, maybe three times now, is what are we to draw from the fact that Section 5, or Article 5, refers specifically to Class 1MM notes and Class 1A notes, not just Class 1 notes, but the two categories of class within Class 1, and uses the term pro rata. I think what one can draw is that the use of the word pro rata in the ordinary course priority of payments dealt with a non-acceleration scenario, a more ordinary course scenario, where payments were coming in every quarter and being paid out, and there were very detailed steps that needed to be followed with respect to distributions. What Section 7 deals with is a situation where an acceleration has been declared, the music has effectively stopped, and the question is what is the relative priority among the various classes of notes. Would you agree that it would have been much clearer? Your Honor, we wouldn't be here. In that same language that appears in Article 5, the pro rata language appeared in Article 7. That's absolutely correct, Your Honor. We wouldn't be here. But because the word together was used in Section 7 and not pro rata, we have to ask, well, what do the drafters intend when they decided to incorporate the definition class 1 notes, instead of doing what Your Honor is pointing out they did in Class 5, in Section 5? You know, it's interesting to me there's this other argument that in 701B and 701C, it uses language that's parallel to the language that's used in 701A. And it's just really priority of classes, and it does not deal in the way that Article 5 deals with priority within a class. What's your response to that? Section 1 only has this impact, this dispositive impact that notes, the IM notes and the IA notes have to be paid pro rata together, because it uses a defined term together. I concede it's not as artfully done as we would like. I concede that had the word pro rata been used, had — it strikes me, Your Honor, that what we're doing is we're — we're accepting that the plain language of Section 701A is that these notes have to be paid together in cash and in full before any other notes are paid. Together has a temporal element. Together means at the same time. So what we're — what we're saying is, well, when I look — Does together mean as much? Does together — it means at the same time. Does it mean that each one gets as much as the other? Well, Your Honor, it certainly doesn't mean sequentially, which is what American General is arguing. Together is the opposite of sequentially. And so what we're saying is the plain language of Section 5, when viewed in context, the context creates questions, ambiguity, whatever you might call it. But the plain language of Section 701 is what it is. It says pay these notes together after an acceleration. And what the OM does, the offering memorandum, in its clear and unequivocal and still unexplained statement, meaning there's no — there's no counterpoint to this statement, that if at event a default occurs and the principal of the notes is accelerated, payments of principal will be made to the Class 1M notes and the Class 1A notes pro rata. That provision, it mirrors the Section 11 — I'm sorry, the Section 701 payment rule. It substitutes the word pro rata for together. That makes sense because in a context like this, where you have notes, the IMs and the IAs that have different principal balances, paying them together means paying them in an amount proportionate to their outstanding balance or pro rata. And that rule, the rule of Section 701A and the rule set forth in unequivocal language in the offering memorandum, is not contradicted anywhere in the trust documents. There is no provision anywhere in any of the documents, transaction documents or the offering memorandum, that talks about paying principal after acceleration and conflicts with that plain language. You would agree — and I think that Judge Calabresi asked this question — but you would agree that if there were a conflict between the offering memo, memorandum and the transaction documents, the transaction documents and our understanding of those would prevail? Not necessarily, Your Honor. There are cases, Judge Hellerstein's decision — But the offering memorandum here explicitly, I think, acknowledges that the transaction documents should take precedence in the event of a conflict. And generally, that's the case. There are circumstances where it's so obvious that the transaction documents did not implement the intention of the drafters as set forth in the offering memorandum that — That we should ignore the language in the offering memorandum about the conflict. No. No, Your Honor. I'm missing something then. With respect to — generally speaking, the offering memorandum, which is the disclosure document provided to the regulatory agencies, the document used to market these notes to investors — Goes to the investors, yes. Right? It says you obviously have to look to the contract to see the terms that we're describing to you in plain language here in contract form. What this contract also does, the security agreement, in Section 1101, and this really demonstrates how critical the offering memorandum is to the transaction, is it says that the issuer here at any point in time, without the consent of noteholders, can unilaterally amend the security agreement to conform to the offering memorandum. That demonstrates how important the offering memorandum is to the deal. It also demonstrates why in considering the factual matrix and what would have been significant to a reasonable person at the time of this transaction, any investor in this transaction needed to look to the offering memorandum because that investor understood that at any point in time the issuer could conform the security agreement to match up to the offering memorandum. You just said that the document can be amended to conform to the offering memorandum. Now, that, you say, says the offering memorandum is important. But to me, it says the offering memorandum is not what governs. But if the parties, relevant parties, want it to, they can amend to make it be. So since they haven't done, I don't see why it becomes important. I mean, it is important in the fact that they could be made part of something, but until it is, it isn't part of something. Your Honor, it's important because it's part of the factual matrix. Under English law, it must be considered. It's important because under this Court's decision in This Is Me and this Court's decision in Bank of America in 2012. That's a different argument. Understood. I just was puzzled by your argument of saying it is important because it could be made part, as saying, therefore, it is part, which is not. Your Honor, entirely fair. And to your point, if there was a direct conflict between the security agreement and the offering memorandum, if the security agreement said in the event of an acceleration, we have that, right? Don't make it pro rata. That would be a conclusion. That's not our situation. But to your question about 501H and the conflict between Section 5 and Section 7, Section 7 sets forth these bold priorities, these bold high-level payment rules, pay the ones together, ones before twos, twos before threes. To the extent that those priorities came into conflict with some of the other rules in Section 5, and, for example, the first six steps in the Section 5. I don't understand. That's the kind of conflict that 5 and 7 are addressing. You have to pay administrative fees before you pay the Class I note holders. Thank you very much. Things like that. You have reserved rebuttal. Thank you, Your Honor. And we'll hear from Mr. Hawkins. Good morning, Your Honors. I'll speak into the microphone. Good morning, Your Honors. Howard Hawkins from Cadwalader for American General. The transaction documents here, which do not include the offering memorandum, include the trustee, the security agreement, and the notes. They all clearly provide that both before and after default and before and after acceleration, if the collateral coverage tests fail, the 1M notes, the double M notes get paid before the 1A notes. That's what Judge Woods held below, and he was correct. The issue on this appeal is whether, under English law, Serengeti is permitted to look to extrinsic evidence of the offering memorandum to change the clear and unambiguous terms of the transaction documents. But English courts, like New York courts, follow the basic principle that unambiguous contracts should be enforced according to their terms, and this is reaffirmed in the 2015 decision of the UK Supreme Court, formerly known as the House of Lords, in Arnold v. Britain. Here, the offering memorandum cannot be read to modify the transaction documents. Now, these double M notes, which are held by American General, were issued as money market securities, designed to be held under SEC rules by mutual funds that had to have highly liquid securities of minimal credit risk. In fact, they're rated by Moody's as P1, which means prime one, which means short-term rating of superior ability and quality to pay. They are different than the 1A notes. And as typical in the... How are they different in terms of the credit rating? The... All the class one notes have the same long-term rating, but the A notes have no short-term rating, whereas the double M notes have a P1 Moody's short-term rating. So, in other words, they were designed to be highly liquid and minimal credit risk. Now, this is typical in structured finance transactions, that the highest level of priority of notes gets the highest level of This is not an unusual result to construe this deal that way. Now, there's no dispute that in 2007, the collateral coverage test failed for the first time. And starting in 2007, the double M notes got paid principal first. That has been the case for 10 years. Serengeti is trying to argue that when they accelerate, somehow the payment priority goes back. I think that the argument is that there's something different embedded in section 7 about acceleration. But, Your Honor, as I think the members of the panel have already pressed Mr. Hannon on this, section 7 does not address priority as between the double M's and the A1's. It just does not. Section 5 does. And section 5, in the priority of payments, is absolutely clear that when the collateral coverage tests fail, the double M's come first. And the collateral coverage test failed in 2007. And the event of default, which occurred in 2014, was also based on a further failure of collateral coverage. In other words, the failure of the principal amount of the collateral to be equal to the sum of the class 1 notes. What do you make of the word together that the opposing counsel emphasized so frequently? Your Honor, the word together, first of all, in the glossary, which is an odd place to put a payment rule, but in the glossary it says page A90 of the appendix, page 9 of the glossary. Class 1 notes is defined as follows. Class 1 notes means the class 1M notes and the class 1A notes together. It describes them as a group. It does not speak to a sequence of payment. As Judge Woods quite properly said, article 5 or section 5 has a detailed sequence of payments. You pay the trustee fees first. You pay other expenses second. You pay the collateral management fee. Then you go into the notes and you pay in the specific order of section 5. The word together certainly is not a clear word, as Your Honor indicated. It certainly doesn't say prorated. It doesn't say sequential. Together just refers to a group. One can look up the dictionary definitions of together. I did. None of them are of assistance in determining this dispute. I would also point out that on the same page of the glossary, I would draw the Court's attention to the definition of class. It's actually right above class 1 notes. The definition of class, it reads as follows, quote, all of the securities having the same right to payment, interest rate if any, and stated maturity if any. Under that definition, it's absolutely clear that the 1M notes and the 1A notes are not the same class. They have a different interest rate and they are treated differently throughout the sections. In fact, if one was to take the word together and read it the way appellants would read it, that would completely override multiple sections of section 5. In other words, why limit the word together to section 7? Class 1 is referred to in many places. Throughout section 5. Throughout section 5. So really the essence of this appeal is that there's no basis. There's no answer in section 7. And for Your Honors to rule in favor of the appellants, they would have to do at least two things or Your Honors would have to do at least two things to rewrite this agreement. First, you'd have to write a priority of payments provision into section 701. You'd have to write in prorated if that was what Your Honor thought was purpose. Your Honor should not be rewriting the contracts. More importantly, Your Honors would have to ignore or completely rewrite the priority of payments in section 5. Section 5 specifically says when there's a failure of coverage test, it doesn't say before acceleration, when there's a failure of coverage test, which there still is today, double Ms get paid first. You would have to either strike that out or write a new provision, insert a new provision in section 5 that says, however, notwithstanding what we just said, after acceleration, the priorities reverse again. That's a lot of rewriting. I ask you out of curiosity, why were these one or two sections picked out for English auto-apply? Your Honor, I think perhaps even in 2003, there was a sense that the English courts treat creditors well. I think at that time in 2003, there was the thought that creditors are treated well in New York courts also. I don't have an answer, Your Honor. The record doesn't reflect it. It's possible it would make them more attractive to non-U.S. investors or to U.K. investors. Were there any parties, the issuer? Well, there are Cayman. The issuers are Cayman. And, of course, Cayman law does derive from English law. So it's possible that that's part of it. The Cayman issuers are done specifically so non-U.S. investors can invest. So Your Honor may have hit the point. Cayman Islands aren't directly linked to England, do they? They follow English law. They follow an old version of English law, I believe. They're independent of England. Yes. No, they're independent now. Yes. But many of the Commonwealth nations still follow English law or sometimes follow an old version of English law. Your Honors, my time. Why then in Section 5 is there a reference to pro rata in terms of after a coverage test failure? No. After a coverage test failure, it goes to sequential. That reference to pro rata is the normal course. I think that's common ground. Am I misreading this? Okay. The pro rata is only? I'm looking at 328 and the reference there to pro rata. 328. If the restrictive senior par value test is not satisfied, the principal amount of Class 1MM notes and the Class 1A notes pro rata. I'm just trying to find where Your Honor is. Exactly on page 328. Section B. I think the different coverage tests. Yes, Your Honor, I understand. I think, Your Honor, those are the interest coverage tests, and I think that the principal coverage tests are the ones that trigger the sequential. Given what you've said, just thinking about the big picture, why would the Class 1MM note holders agree to pro rata payment? Only of interest. Okay. I mean, the deal has a series of sort of crises. When one gets worse and worse, things change. But the entire thrust of the shift is in favor of the 1Ms. And my opponent didn't mention it, but, of course, the explicit subordination of the 1A notes is in the notes themselves, in the form of notes themselves, which we think is a very powerful point in our favor. Briefly address the attorney's fees issue. Yes, Your Honor. And I guess in particular what law applies. Pardon me, sir? What law applies. Well, there's no question that English law governs this dispute. Articles 5 and 7 and all of the notes and all of the trust agreement. That isn't the issue. English law governs, and it is substantive here because interest is, and the district court, I think, was a little bit confused on that. But the issue is, is this against New York public policy where it does not say it expressly? And there are plenty of cases in New York that say, unless it says expressly that there should be lawyers' fees, we do not give it because it is against our public policy. I have not found a case in New York that says expressly in a choice, but the same thing applies to a choice of law situation. But why doesn't the general rule of New York that they will not give lawyers' fees unless it says so expressly apply as much here? Your Honor, I think that the simple answer is that it is part of the agreement of the parties. An English law contract contains the substantive right to recover legal fees in a dispute, and New York courts always will enforce a contractual agreement to give attorneys' fees. If it makes, but with respect to lawyers' fees, they've always wanted it to be expressed. And, Your Honor, all I can say is that every English law contract, if put into litigation, results in the recovery of fees. Everyone knows that. Has that anything to do with English litigation? It is a feature of English law, and therefore we would say— I have no doubt about that it is a feature of English law. I'm just wondering whether New York will consider the fact that it is in English law enough to make it express and overcome this very strong, I think a little bizarre myself, requirement of New York law that we will not give attorneys' fees unless they are expressly mentioned. Well, Your Honor, there's no decision by this court. There's no decision by the New York Court of Appeals. What is to certify? Well, you could do that, Your Honor. I've done that before, but the last time that happened in this court, we went all the way to Michigan, and the Michigan Supreme Court refused to answer the certified question. So the panel— New York tends to be more friendly. Yes, Your Honor. But in any event, if New York declines certification— Well, then Your Honor's decide. Then they're giving us a free ride. Yes. Nothing wrong with that. Yes. So you would have no problem with certification then? No, Your Honor. I think the New York Court of Appeals would be very interested in this issue. It's an important issue. We have five judges in the Southern District who ruled in our favor on this issue, and they're good judges. Judge Haight, Judge Codal, Judge Cote, and Judge Martin. They all ruled that English law contracts mean recovery of legal fees. Judge Wood ruled the other way. Yes, but as Your Honor said, I think he got the substantive versus— He's a good judge, too. I think he was my student some years ago. Could you give me a reason of policy why English law should apply? Well, I think this is a perfect case for it, Your Honor. These are two sophisticated counterparties. You said before that the reason that they chose English law really had nothing to do with this, that it had to do with the fact that they may have viewed the English courts as more favorable to creditors. Was anybody really thinking about this, thinking about the question of counsel fees? Your Honor, all I can say is that in this day and age, there are two centers of law and courts in this world that compete for transactions in structured finance and other sophisticated financial instruments, and one is this court and the New York courts, and the other one are the courts of London. So I think that to enforce English law on this transaction, when it's clearly governed by English law, is completely consistent with modern public policy considerations, particularly— Modern consideration in light of the fact that if you take a look at the page, at SPA, the Special Appendix 27, the Mighty Midgets case, where the New York Court of Appeals has held that the New York rule reflects a quote, reflects a fundamental legislative policy decision that say, for particular exceptions or when the parties have entered into a special agreement, it is undesirable to discourage submission of grievances to judicial determination and that in providing freer, more equal access to the courts, the present system promotes democratic and libertarian principles. That's a pretty strong statement. Your Honor, but I would give the same answer that I did to Judge Calabresi, which is that this is an agreement by the parties by virtue of English law. It doesn't say that we agree. It doesn't say anything about counsel fees. But no English law contract would, Your Honor. They would simply say English law governs. Yeah, but the question is when the parties agreed to English law, did they agree to English law with respect to most of the contractual reasons because English courts are, as you've said, particularly good, favorable to credit or whatever, but did they also so clearly intend to do this, which is so strongly against New York policy unless they mean it clearly? That's the question. Your Honor, all I can say is that I've seen a lot of English law contracts and they don't contain attorney's fees provisions in them because everyone knows that's part of English law. Okay. Thank you very much. Mr. Hannan. Your Honor, we'd love for this to be a fee-shifting case when it's — Speak right into the mic. I apologize. When it's remanded and we win. But it's not an English law contract. This is a contract governed predominantly by and presumptively by New York law. It's a contract that has a mandatory New York venue clause. Any dispute relating to the North Lake transaction must be brought in the courts of New York. It would be not just contrary to public policy. It would be unprecedented in this type of case to infer an unmistakable intent to incorporate English law fee-shifting principles in a contract that's not only governed predominantly by New York law, but has a mandatory New York courts provision. I mean, there's a lot of New York here, right? There's a lot of New York here. Ultimately, that's why we didn't argue for fee-shifting, because this is not — even before you get to the procedural substantive analysis Judge Woods engaged in, this is not an English law contract. There's no conflict. There's a New York courts' choice of law — I'm sorry, a New York mandatory venue clause here for disputes. It's not an appropriate case for fee-shifting. If I may, though, Your Honors, I'd like to address one thing Mr. Hawkins said about the restrictive par value test. Your Honor was looking at the language saying, well, why would the IMs agree to pro rata for this restrictive par value test? And Mr. Hawkins said, well, it's because that was an interest-related test. No, it's not. It was just a coverage test that applied to a slightly different circumstance. And the reality is the relative priorities between the IMs and the IAs throughout this agreement vary dramatically. They were pari pursu for all purposes except for otherwise specified. And the way they were specified in Article VII was to be paid together. I also want to address — I think Mr. Hawkins answered your question, Judge Lahaye, and resolved, I think, this dispute. He said, well, look, it would lead to very odd results if you read the defined term Class 1A and 1M notes together into the payment priorities in Section V. That would lead to odd results. That might be true. And that's why if you read Section V, in every single instance, the drafters used — they didn't use Class 1 notes. They used the Class 1A and the Class 1M notes together. I'm sorry, independently. They actually spelled out the Class 1A notes and the Class 1M notes, because by using the defined term Class 1 notes, there are implications for the contract provision. And it's those implications in Section VII, as shown in distinction from the drafter's that show why we need to afford Section VII and its use of the term together some meaning. At a bare minimum, we're talking about the plain language of Section VII. As confirmed by the offering memorandum, this is not a case that should have or could have been decided on the pleadings under English law or New York law. There is substantial ambiguity. What aims to — Breyer, this is your fallback test. Well, it's a fallback, but it has the benefit of being true. I mean, I think there's a basis here on the plain language for saying that Section VII, when you look at the word together, the plain language, taken with the offering memorandum, the result should be reversed, because there's really no other way of looking at it. But at a minimum, that's a reasonable competing interpretation that requires extrinsic evidence, further analysis. That's also true under English law, which requires consideration of the factual matrix. It's reversible error not to consider the factual matrix. It didn't happen here. We need to — Would you, to go back to the attorneys' fees issue, if we get to that issue, would you object to certification? Would you have a problem with that? I would, Your Honor, because I think it would be, certainly if it's the Court's pleasure, it can be done. I don't think it's an appropriate case. It's a case — it's not an English law contract. Every other decision where attorneys' fees were awarded were governed by English law, governed by every — in the entirety. None of those cases had mandatory New York choice-of-venue provisions. This subtext of New York law. Yeah. I think it's the wrong test case, although intellectually interesting. Isn't that a question for the New York court of appeals to decide? That is, we can certify, they can accept or not if they don't feel it's the right case for them to talk. I'm not saying we should certify because it may not be appropriate for the reasons you give, but whether it is ultimately a case on which New York wants to speak or whether they want to wait for another one is something that really is up to them. They don't need to accept certification. The New York court of appeals can certainly make their own determination, Your Honor. Thank you very much. Thank you, Your Honor. We'll reserve decision. We'll argue on both sides, and we'll hear argument.